ROBERT R. WOTT AND CYNDY A. WOTT, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Wott v. Commissioner
Docket No. 19455-82.
United States Tax Court
T.C. Memo 1986-319; 1986 Tax Ct. Memo LEXIS 293; 51 T.C.M. (CCH) 1577; T.C.M. (RIA) 86319; July 28, 1986. Bernard Wiczer, for the petitioners. Julia M. Dewey, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: Respondent determined deficiencies in Federal income tax against petitioners *296 as follows: Taxable Year Ended
Deficiency
December 31, 1975
$4,215
December 31, 1976
3,221
December 31, 1977
5,179
December 31, 1978
9,265
The issues presented for decision are: (1) Whether petitioners are entitled to claimed business expenses in connection with the operation and maintenance of a 44-foot motor yacht during 1978; (2) whether petitioners are entitled to a claimed depreciation deduction for 1978 with respect to the yacht; and (3) whether petitioners are entitled to an investment tax credit in connection with the purchase of the yacht in 1978; if yes, whether the investment tax credit may be carried back to petitioners' taxable years 1975, 1976, or 1977. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Robert R. Wott ("Robert" or "petitioner") and Cyndy A. Wott ("Cyndy") were husband and wife and residents of Palos Heights, Illinois, at the time the petition herein was filed. Robert and Cyndy (hereinafter referred to, collectively, as "petitioners") filed joint Federal income tax returns for their taxable years *297 1975 through 1978, inclusive, using the cash receipts and disbursements method of accounting. During the years in issue, Robert was a practicing certified public accountant and Cyndy was a beautician. Robert was first employed by George Bagley & Co. (sometimes referred to as "the partnership"), an accounting firm, in 1962 and became a partner in 1971. The business offices of George Bagley & Co. were located at 135 South LaSalle Street, Chicago, Illinois. Facilities at that location included conference rooms and private offices for the partners. On May 1, 1977, the partners of the firm, including Robert, entered into an amended partnership agreement. The agreement provided that the partners were responsible for promotional and local travel expenses incurred by them. Expenses incurred by the partners in attending conventions, or in connection with business entertainment of employees of the First National Bank of Chicago, of colleges, or of business schools were to be considered a firm expense. All other funds expended for the business of the partnership were to be reimbursed to the partners by the partnership. In June 1978, petitioner purchased a new 44-foot Trojan motor *298 yacht from Rodi Boat Company, Chicago, Illinois. Robert traded in his 1974 36-foot Trojan tri-cabin boat for the 44-foot yacht. Petitioners agreed to pick up the yacht at Elkton, Maryland, and because of this they were given a credit of $5,000, representing launching and handling costs (including delivery costs), towards the purchase price of the yacht. The yacht had to be brought from Elkton, Maryland, to New Buffalo, Michigan, used by petitioner as his home port. Horizon Credit Corporation financed a substantial part of the purchase price of the yacht. Robert represented to Horizon that the yacht was to be used for personal, family, or household purposes. William Youngquist, Robert's partner, loaned Robert $10,000 to purchase the yacht. Cyndy had no boating experience prior to her marriage to Robert in 1970. Her role aboard the yacht was that of a hostess, preparing and serving food and entertaining the spouses and children of the guests aboard the yacht. Petitioners picked up their yacht at Elkton, Maryland, on June 26, 1978.They went through the Chesapeake & Delaware Canal, sailed down Delaware Bay to the Atlantic, and traveled up the East Coast to the Hudson River. Passing *299 up the Hudson to Troy, New York, the yacht then passed through the Erie Canal to Lake Ontario. Sailing along the south shore of the lake, petitioners took the Welland Canal in Canada to Lake Erie, and went south across Lake Erie to Erie, Pennsylvania, arriving on July 5, 1978. Aboard the vessel during this trip were Harry and Pat Myers, their 13-year old son, and Cyndy's sister. Both Robert and Harry Myers belonged to the Southern Shore Yacht Club, where they met in 1974. Harry was not a client of Robert or of George Bagley & Co. They were social friends. Harry was the president of A-1 Foundry Company in Chicago, Illinois, which he owned together with his wife. In order to handle a 44-foot Trojan yacht safely and properly, Robert needed at least two other persons aboard for line handling; while Robert was at the controls, one person would secure the bow line and the other would secure the stern line. This was especially true during the first part of the trip from Maryland to Erie, Pennsylvania, because of the frequent line-handling requirements in transiting the locks in the Erie and Welland Canals, and in berthing for the night. Harry was an experienced boater and could and *300 did help petitioner with the lines. Prior to 1978, Robert had had a client who owned an iron foundry in Wisconsin and who had expressed interest in acquiring other foundries. During the trip, Robert discussed the possibility of Harry's selling his foundry, which Robert thought might involve a good fee arrangement for him. Harry commented on the possibility of selling the foundry but was not really excited about the sale. Petitioners and their party left the yacht in Erie, Pennsylvania, on July 5, 1978, for repairs, and went home. A number of mechanical problems with the yacht had occurred on the trip -- the air conditioning broke down, the two electrical alternators burnt out, and the fuel injectors of the diesel engines were not properly set, causing extensive deposits of soot on the yacht. The repairs were made between July 6 and 12, 1978. On July 13, 1978, Robert picked up the yacht at Erie, Pennsylvania, and sailed it to New Buffalo, Michigan, at the southern end of Lake Michigan, arriving on July 18, 1978. Also on board during this trip were Raymond Grana and George Lebeda. Raymond Grana and petitioner met in 1973 at the Southern Shore Yacht Club at the Jackson Park *301 Inner Harbor. Grana owned a boat that was moored there. Grana and Robert became friends and saw each other between five and eight times a year; Grana had been to petitioners' house on several occasions. Robert's only purpose for inviting Grana on this trip was to help him handle the lines in order to bring the boat to New Buffalo, Michigan. Grana did not have a business relationship with Robert or with the partnership. George Lebeda was also a long time member of the Southern Shore Yacht Club, where he met Robert and Grana, and also had his boat docked in New Buffalo, Michigan. Lebeda was the owner of Ace Hardware Store in Chicago, Illinois. Lebeda had expressed his desire to sell his business and Robert took advantage of the opportunity to discuss various methods by which Lebeda could sell his business. They left the yacht in New Buffalo, Michigan on July 18, 1978. On July 23, 1978, petitioners gave a champagne party aboard their yacht for the members of the Lake Michigan Yacht Club in New Buffalo. Robert had been a member of the Lake Michigan Yacht Club since 1974, but had never docked the yacht in New Buffalo before. A champagne party was traditionally given by the owners *302 of a vessel newly moored at the yacht club. The purpose for the party was purely personal, and no business was discussed nor resulted to petitioner as a consequence of the party. On July 30, 1978, petitioners cleaned the yacht and on July 31, 1978, a diesel mechanic from Cummins came aboard to repair the engine. On August 6, 1978, petitioners entertained Cyndy's family aboard the vessel. The purpose for this entertainment was purely personal. Petitioners entertained William Jordan and his fiancee aboard the yacht on August 13, 1978. William Jordan was an attorney and a business associate of Robert. Jordan handled legal matters for some of Robert's clients, and Robert did accounting work for some of Jordan's clients. Jordan called Robert a few days before August 13, 1978, and told him that he would like to discuss Tackberry's businesses. Tackberry, Jordan's client, needed an accountant and Jordan wanted to explore the possibility of Robert's becoming Tackberry's accountant, which Jordan thought was a means to cement his attorney-client relationship with Tackberry. Robert invited Jordan to the yacht, where they discussed Tackberry's businesses. Although Cyndy was also on *303 the yacht, she did not participate in the conversations between Robert and Jordan and stayed with Jordan's fiancee on the lower level of the yacht. Robert took the yacht out to Lake Michigan, where they spent the day. George Arquilla was the vice president of Burnside Construction Company. George built the townhouse development in which both petitioners and the Arquillas lived, in Palos Heights, Chicago, in 1977. George Arquilla did not have a business relationship with Robert or with George Bagley & Co. in 1978. Arquilla and his wife were invited aboard the yacht and entertained by petitioners on August 20, 1978. George and Robert discussed the state of the economy and of George's company. Robert discussed his experience as an accountant, his association with George Bagley & Co., and the type of clients that they had. This discussion did not last more than a half hour. This was a casual, social discussion, not directly related to any specific business matter. In 1978, Burnside Construction Company had an in-house comptroller and accounting staff. No business for Robert or for George Bagley & Co. resulted from the discussion aboard the vessel on this trip. Robert noted on *304 his log that he and George had "Discussed setting up of home-owners association, Oak Hills construction program & services GB & Co. renders." Petitioners and the Arquillas spent New Year's Eve together in 1978. The Arquillas were invited to and spent the fourth of July weekend aboard the yacht in 1979. On August 27, 1978, petitioners entertained Mr. and Mrs. Allen Eliot aboard the vessel. Allen Eliot was a partner of George Bagley & Co. Eliot and Robert discussed billing rates, personnel matters, clients, and the future of the partnership from the standpoint of the partners. Eliot had mentioned to petitioner that he was considering retirement and this was also discussed. Eliot and Robert met outside of the partnership's offices since they did not like to discuss personnel matters there because of the numerous interruptions. Neither Cyndy nor Mrs. Eliot participated in the business discussions between Eliot and Robert. The nature of the relationship between Eliot and Robert was strictly business. On August 28, 1978, petitioners entertained Mr. and Mrs. William Youngquist and Mr. and Mrs. Robert Hutchinson on the yacht. At the time, William Youngquist was a partner in George *305 Bagley & Co.; Robert Hutchinson was his personal friend and client. In 1978, Youngquist allowed Robert to start billing on his clients' accounts. Hutchinson was the president of a water treatment company, H.O.H. Youngquist and Hutchinson were invited on the yacht for the purpose of discussing Hutchinson's business affairs. Hutchinson was contemplating bringing in his son to work for him. The possibility of developing better data processing and of making contributions to H.O.H.'s profit sharing plan were discussed. They also discussed the convenience of a pension plan as compared to the existing profit sharing plan. Hutchinson was not a friend of petitioners. Petitioner did some work for Hutchinson before 1978, and all of his accounting work in 1978. Hutchinson and Youngquist also discussed the possibility of Youngquist's retirement. Neither Cyndy nor Mrs. Youngquist or Mrs. Hutchinson participated in the business discussions, but stayed on another section of the yacht. Petitioners entertained Robert Drewniak and a Mr. and Mrs. Guerin aboard the yacht on August 29, 1978. Drewniak was the chairman of the board of Apex Railway Products Co. and a client of George Bagley & Co. *306 The Guerins were personal friends of Drewniak and were invited by him. Robert invited Drewniak on the yacht for the purpose of discussing the billing of Apex, since Drewniak had expressed some concern that the bills were too high. There was also some discussion as to whether a revenue ruling should be requested from the Internal Revenue Service in order to determine whether under the provisions of its pension plan Apex could borrow funds to invest in Treasury Bills. On September 3, 1978, petitioners entertained Jay M. Smyser and Kathy O'Leary aboard the vessel. Smyser, an attorney, has been a client of Robert since approximately 1969. Kathy O'Leary worked as Smyser's paralegal. Smyser was invited on the yacht to discuss his tax status, certain expenditures that he wanted to incur for promotional purposes, and the termination of his association with Phalen & Pope, a law firm. Robert also wanted to ascertain whether Smyser's business associates would be interested in his services. Although Smyser considered Robert his friend, the relationship between them was essentially of a business nature. Petitioners entertained John and Georgia Kuranz and their children, ages 2 and 4, *307 aboard the yacht on Labor Day, September 4, 1978. Also present were Mr. and Mrs. J. L. Kuranz, the parents of John Kuranz. In 1978, John Kuranz was the owner of Management Contents. Both John Kuranz and his father J. L. Kuranz were clients of Robert. J. L. Kuranz was also a stockholder of Management Contents. Labor Day was a convenient time for J.L. and John Kuranz and Robert to meet in order to discuss the quarterly financial statements, sales, receivables, and cash requirements of Management Contents. J. L. Kuranz and Robert further discussed matters related to Stark Enterprises, Kuranz's company in Georgia. Georgia Kuranz, Cyndy, Mrs. J. L. Kuranz, and the children were not present during these discussions, which were conducted on the lower level of the yacht, but were at the beach. They did not go out on the yacht. On September 9 and 10, 1978, petitioners entertained Mr. and Mrs. George Lebeda aboard their vessel. Petitioners and the Lebedas sailed from New Buffalo, Michigan, to Kenosha, Wisconsin, and back to New Buffalo. Robert had been acting as George's money manager. Robert was paid a fee for managing approximately $100,000. George was thinking about withdrawing *308 the money, which petitioner dissuaded him from doing. In addition to this, the Lebedas and Robert discussed the possibility of Robert's doing some estate planning for them, which never materialized. The Lebedas were old friends of Cyndy; their children and Cyndy had attended the same grammar school. On September 17, 1978, petitioners entertained Raymond and Mary Krysl aboard the yacht. Raymond was an attorney and an accountant, and was a partner in George Bagley & Co. in 1978. Raymond was invited on the yacht in order to discuss personnel matters and the allocation of profits as per the partnership agreement, in view of impending retirement of one of the partners. The yacht afforded them privacy. The nature of the relationship between Raymond and petitioner was strictly business. On September 18, 1978, mechanics from both Cummins and Onan serviced the engine and the generator of the yacht, respectively. On September 24, 1978, petitioner went to New Buffalo, Michigan, and took the yacht to Rodi's Boat Yard in Chicago, Illinois, for repairs. Robert entertained William Jordan, Mr. and Mrs. Frank Nichols, and another couple aboard the yacht on September 29, 1978. Frank Nichols *309 was an Englishman who was Jordan's client. Jordan phoned Robert and apprised him that Nichols was in Chicago for two days and was contemplating the possibility of developing distributorships and a boat manufacturing facility in the United States. Since one of the areas that Nichols was concerned about was the tax aspects of the transaction, Jordan wanted to schedule an appointment with Robert for Nichols. Robert stated that the yacht was at Rodi's Boat Yard in Chicago and that he was going to pick it up that afternoon, and suggested that they meet there. Nichols invited two friends of his to come along. They went to Rodi's Boat Yard where they met with Robert. From there they went down the Chicago River to the Chicago Yacht Club, where they had dinner and drinks. On the way to the Chicago Yacht Club, Nichols and Robert discussed Nichols' concerns. Nichols and his friends left after dinner and Jordan and Robert took the yacht back to New Buffalo, Michigan. During the trip to New Buffalo, Michigan, petitioner and Jordan reviewed the earlier discussion between Robert and Nichols. No business for petitioner or for George Bagley & Co. resulted from the discussions held aboard *310 the vessel during this trip. On October 1, 1978, petitioners entertained Emily Lebeda, George Lebeda's mother, and her daughter aboard the yacht, in New Buffalo. Emily had requested a meeting with petitioner in order to discuss payment of a note given to her by her daughter. Robert talked to Emily about the possibility of redrafting her will. After the discussion, which lasted approximately two hours, petitioners went back to Chicago. Robert entertained Charles Massaro aboard the vessel on October 21, 1978. Massaro was the comptroller of Wisconsin Can Company and the president of its subsidiary, Rex Filter Corporation. These companies were clients of George Bagley & Co. Massaro was invited on the yacht in order to discuss Rex Filter's audited financial statement as of November 30, 1978. The relationship between Massaro and Robert was of a business nature in 1978. Petitioner maintained a log on the yacht, listing: (1) The days that the yacht was used; (2) the persons entertained, if any; (3) the purpose for the entertainment; and (4) whether, in his opinion, the reason for inviting the indicated guest on the yacht was business or pleasure. The entries on the log were made *311 at the end of each use of the yacht. The log indicated that the yacht was used 31 days for entertainment in 1978. Petitioner indicated in the log his opinion that 30 of the 31 days, or 96.77 percent of the yacht's use for entertainment, was for business purposes. Robert was not reimbursed by George Bagley & Co. for the expenses incurred for the operation and maintenance of the yacht in 1978. The yacht was used on 42 calendar days in 1978 -- 19 calendar days of use were for personal or nonbusiness purposes; 11 calendar days of use were for repair or maintenance purposes; and 12 calendar days of use were for business purposes. Robert's reported distributive share of income from the partnership in 1978 was $57,110. He claimed business expenses in the total amount of $54,012 -- of which total $47,611 were attributable to the yacht -- for a total net income from the partnership of $3,098 in 1978. Petitioners' claimed items of expense and credit in connection with the operation and maintenance of the yacht were as follows: Fuel
$ 2,027 Insurance
1,655 Repairs & Maintenance
1,239 Supplies
770 Moorings
1,565 Storage
221 Yacht Club Dues, Etc.
401 Interest Expense - Boat
8,465 Depreciation Expense
[1] 32,857 Maintenance and Operating Expenses
$49,200 Less: Personal Portion (3.23%)
[2] (1,589)
Total Claimed Business Expenses
[3] $47,611 *312 Petitioners also claimed an investment tax credit with respect to the purchase of the yacht in the amount of $14,349.35 in 1978. [4]
*313 Petitioners filed Form 1045, Application for Tentative Refund, on March 6, 1979. Because their return showed zero Federal income tax due for 1978, the unused claimed investment tax credit in connection with the purchase of the yacht was carried back to petitioners' taxable years 1975, 1976, and 1977. In his notice of deficiency, respondent disallowed a portion of the claimed maintenance and operating expenses, depreciation expense, and investment tax credit with the following explanations: Out of Pocket Expense - Boat
The deduction of $7,623.00 [5] shown on your 1978 return as boat maintenance and operating expense is reduced by $3,736, because it has not been established that more than $3,887.00 was for an ordinary and necessary business expense. The $3,736 is also unallowable because it is lavish and extravagant pursuant to Internal Revenue Code Section 274 and the Regulations thereunder. Accordingly, your taxable income for the year 1978, is increased $3,736.00. Depreciation Expense - Boat
The deduction of $31,796.00 [6] shown on your 1978 return as boat depreciation is reduced by $29,515.00 because that amount is lavish and extravagant *314 within the meaning of Internal Revenue Code Section 274 and the Regulations thereunder. Therefore, your taxable income, for the year 1978, is increased $29,515.00. Investment Tax Credit
The $14,349 [7] shown as an investment credit in 1978 on a Trojan 44 Ft. yacht is disallowed because the property does not qualify for the investment tax credit under Section 48 of the Internal Revenue Code. Therefore, your tax is increased in the years in which the credit was applied as follows: Credit carried back to 1975
$4,215.00
Credit carried back to 1976
3,221.00
Credit carried back to 1977
5,179.00
*315 OPINION Issue 1. Business Expenses and
Issue 2. Depreciation
Section 162(a)[8] allows as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. As used in section 162(a), "ordinary" has been defined as that which is "normal, usual, or customary" in the taxpayer's trade or business. Deputy v. DuPont,308 U.S. 488 (1940); Boser v. Commissioner,77 T.C. 1124 (1981), affd. in an unpublished opinion (9th Cir. 1983). The Supreme Court stated in Welch v. Helvering,290 U.S. 111, 113 (1933), that "necessary", as used in the predecessor of section 162(a), means "appropriate and helpful" for the development of taxpayer's business. Whether an expenditure is ordinary and necessary is a factual determination. Commissioner v. Heininger,320 U.S. 467 (1943); Voight v. Commissioner,74 T.C. 82 (1980). *316 Section 167(a)(1) allows as a depreciation deduction a reasonable allowance for the exhaustion, wear, and tear of property used in the trade or business. Sec. 1.167(a)-1, Income Tax Regs.
Section 262 provides that no deduction will be allowed for personal, living, or family expenses. Section 262 takes precedence over sections 162 and 167. [9] Business expense deductions, including depreciation, for items with respect to a facility used in connection with entertainment which are otherwise allowable under sections 162(a) and 167(a)(1) are not to be allowed unless the provisions of section 274 are also met. Sec. 1.274-1, Income Tax Regs.
*317 Section 274(a)(1)(B)[10] provides in part that no deduction otherwise allowable shall be allowed with respect to an entertainment facility unless: (1) The facility was used primarily for the furtherance of taxpayer's trade or business; and (2) the expenditure was directly related to the active conduct of the trade or business. [11] Furthermore, the deduction cannot exceed the portion of such expenditure directly related to the active conduct of taxpayer's trade or business. Sec. 274(a)(1). If deductions are disallowed under section 274(a) with respect to any portion of a facility, such portion is treated as an asset which is used for personal, living, and family purposes, and not as an asset used in the trade or business. Secs. 274(g), 1.274-7, Income Tax Regs.
*318 In his statutory notice of deficiency herein, respondent allowed a portion of the claimed yacht expenses and depreciation, [12] apparently based upon his allocation between business and nonbusiness use. Implicit in this determination was respondent's acknowledgement that petitioners had satisfied the "primary use" test of section 274(a)(1)(B); otherwise all of the claimed depreciation and deductions, other than interest, would have been disallowed. The pleadings were consistent with this analysis of the issues presented. Both at trial and on brief, however, the parties argued and briefed, inter alia, the "primary use" issue, without objection from either side. Since the resolution of this issue has the potential effect of broadening the disallowance of petitioners' claimed deductions, we treat it as a new issue not raised by the pleadings, but tried with the consent of the parties. Rule 41(b)(1). As to the new matter outside the statutory notice of deficiency -- petitioners' entitlement to the claimed yacht expenses and depreciation allowed by respondent, *319 in the respective amounts of $3,887 and $2,281 -- the burden of proof is on respondent. Rule 142(a). In order to satisfy the "primary use" requirement of section 274(a)(1)(B), it must be established that, considering all the facts and circumstances, the primary use of the facility was for purposes considered ordinary and necessary. Petitioners argue that they satisfy the safe harbor test provided in section 1.274-2(e)(4)(iii), Income Tax Regs. Under this provision, an entertainment facility is considered as used primarily for the furtherance of taxpayer's trade or business if it is established that more than 50 percent of the total calendar days of use of the facility during the taxable year were of business use. A facility is deemed to have been primarily used for such purposes on any calendar day if the facility was used for the conduct of a substantial and bona fide business discussion notwithstanding that the facility may also have been used on the same day for personal or family use by the taxpayer or any member of the taxpayer's family not involving *320 entertainment of others by, or under the authority of the taxpayer.Sec. 1.274-2(e)(4)(iii), Income Tax Regs.
A facts and circumstances test is to be applied in determining whether any discussion constitutes a substantial and bona fide business discussion. Sec. 1.274-2(d)(3)(i)(a), Income Tax Regs. It must be established, however, that: (a) The taxpayer actively engaged in a business meeting, negotiation, discussion, or other bona fide business transaction, other than entertainment, for the purpose of obtaining income or other specific trade or business benefit; and (b) such business meeting, negotiation, discussion, or transaction was substantial in relation to the entertainment, viz, that the principal character or aspect of the combined entertainment and business activity was the active conduct of business. Sec. 1.274-2(d)(3)(i)(a), Income Tax Regs.
In order to satisfy the "directly related" requirement of *321 section 274(a)(1)(B), it must be established that: (a) The taxpayer had more than a general expectation of deriving some income or other specific trade or business benefit at some indefinite future time from the occasion; (b) the taxpayer actively engaged in a business discussion, or other bona fide business transaction, other than entertainment, for the purpose of obtaining such income or other specific trade or business benefit; (c) the principal character or aspect of the activity was the active conduct of taxpayer's trade or business. "The active conduct of trade or business is considered not to be the principal character or aspect of combined business and entertainment activity on * * * yachts and other pleasure boats unless the taxpayer clearly establishes to the contrary." Sec. 1.274-2(c)(3)(iii), Income Tax Regs.; Davidson v. Commissioner,82 T.C. 434 (1984); and (d) the expenditure is allocable to the taxpayer and a person or persons with whom the taxpayer engaged in the active conduct of trade or business during the entertainment. Secs. 1.274-2(c)(3)(i) -- (iv), Income Tax Tegs. An expenditure is also considered to be directly *322 related to the active conduct of taxpayer's trade or business if it is established that the entertainment occurred in a clear business setting. Secs. 1.274-2(c)(2) and (4), Income Tax Regs.
Section 274(d) provides in part that an otherwise deductible entertainment expenditure is not deductible unless the taxpayer substantiates by adequate records or sufficient evidence corroborating his own statement the: (1) Amount of the expenditure; (2) time of entertainment; (3) place of entertainment; (4) business purpose of entertainment; and (5) business relationship of persons entertained. See sec. 1.274-5(b)(3), Income Tax Regs.
An "adequate record" is defined in part as an entry in an account book, diary, or similar record made at or near the time of the expenditure. Sec. 1.274-5(c)(2)(ii), Income Tax Regs. As to each expenditure element not substantiated by adequate records, the substantiation requirements may be satisfied by "sufficient evidence, *323 " defined in part as: (1) The taxpayer's own statement, whether written or oral, containing specific information in detail as to such element; and (2) other corroborative evidence sufficient to establish such element. Sec. 1.274-5(c)(3), Income Tax Regs. If such element is the business relationship to the taxpayer or business purpose of an expenditure, the corroborative evidence may be circumstantial. Sec. 1.274-5(c)(3), Income Tax Regs.
Facilities which might be used for, or in connection with entertainment include yachts. Sec. 1.274-2(e)(2)(i), Income Tax Regs. Expenditures with respect to a facility used in connection with entertainment include depreciation, operating costs, and expenses for the maintenance, preservation, or protection of the facility. Sec. 1-274-2(e)(3)(i), Income Tax Regs.
There is no question that petitioners' yacht constituted an entertainment facility and that the expenses claimed by petitioners with respect to the yacht constitute expenditures with respect to an entertainment *324 facility. See secs. 1.274-2(b)(1)(i), 1.274-2(e)(2)(i), 1.274-2(e)(3)(i), Income Tax Regs. Therefore, for the claimed yacht expenses and depreciation to be allowable it must be established that: (1) The claimed yacht expenses and depreciation were ordinary; (2) the claimed expenses were necessary for the development of Robert's accounting business; (3) the yacht was used primarily for the furtherance of Robert's trade or business; and (4) the claimed yacht expenses and depreciation were directly related to the active conduct of Robert's trade or business. Secs. 162(a), 274(a)(1)(B); secs. 1.274-2(a)(2); 1.274-2(c)(1), (2), and (3); 1.274-2(d)(3)(i)(a), Income Tax Regs. It must be clearly established that the active conduct of trade or business was the principal character or aspect of the activity on the yacht. Sec. 1.274-2(c)(3)(iii), Income Tax Regs. Finally, the prescribed elements with respect to the claimed expenditures -- amount, time, place, business relationship, and business purpose -- must be adequately substantiated. Sec. 274(d); sec. 1.274-5, Income Tax Regs.
The amount of the claimed maintenance and operating expenses, *325 and the fact that the said amounts were expended are not in issue here. (The basis of the yacht for depreciation purposes is in issue.) Petitioners have conceded, on brief, that they are not entitled to deduct maintenance and operating expenses and depreciation in connection with their use of the yacht: (1) On July 23, 1978, when they hosted a champagne party for the members of the Lake Michigan Yacht Club; and (2) on August 6, 1978, when they entertained Cyndy's family. Respondent has conceded on brief that the log maintained by Robert substantiates the time and place of the expenditures. While some portion of the claimed expenses and credit sprang from purely social or personal motives, there is evidence in the record to establish that petitioners actually made some use of the yacht which was related to Robert's trade or business. Petitioners acquired the yacht in 1978, and as we have found, it was used on 42 calendar days in 1978. [13] The first use of the yacht was a 10-day cruise -- from June 26, 1978 to July 5, 1978 -- from Elkton, Maryland, to Erie, Pennsylvania. The ultimate goal of petitioners was to transport the yacht to New Buffalo, Michigan. Petitioners invited *326 Harry and Pat Myers, and Cyndy's sister, to come along. The Myers brought their 13-year old son with them. Harry was an experienced boater and was not a client of Robert or of George Bagley & Co. As Robert testified, in order to handle the yacht -- a 44-foot yacht -- safely and properly, Robert needed at least two other persons aboard for line handling, one at the bow and the other one at the stern, while he operated the controls. [14] Cyndy did not have any boating experience prior to her marriage to Robert, and her role on the yacht was only that of hostess. Cyndy's sister was invited, according to Robert because he "needed extra hands;" the record herein is devoid, however, of any evidence that Cyndy's sister had any boating experience or that she could help or did help in handling the lines. *327 While Robert did have discussions with Harry concerning the possible sale of his foundry, we think that the said discussions were not substantial and bona fide. In this regard, we note that Robert's testimony that Harry had mentioned his desire to sell his foundry prior to the cruise was contradicted by Harry, who testified that it was Robert who had approached him and stated that a client of his, who had an iron foundry in Wisconsin, was interested in acquiring a foundry in Mount Ferris. In fact, the business relationship between Robert and his unidentified client had terminated prior to 1978. We are also satisfied that Robert had no more than a general expectation of deriving some income or trade or business benefit at some indefinite future time from the discussion. The principal character of the trip was not the active conduct of Robert's trade or business, but a personal one. See secs. 1.274-2(c)(3)(i) -- (iv), Income Tax Regs.
The yacht remained in Erie, Pennsylvania, from July 6 to 12, 1978, for repairs. [15]
The requirements of section 274 have also not been satisfied with respect to the trip from Erie, Pennsylvania, to New Buffalo, *328 Michigan, on July 13 to 18, 1978. Admittedly, Robert's purpose for this trip was purely a personal one, to transport the yacht to its new home port. Aboard the yacht with Robert on this trip were Grana and George Lebeda. It is undisputed that Grana was an experienced boater and Robert's friend, and that he was invited by petitioner for the exclusive purpose of helping him with handling the lines. George Lebeda was similarly an experienced boater and met petitioner at the Southern Shore Yacht Club. As we have found, Robert and George Lebeda discussed various methods by which Lebeda could sell his business. We are, however, satisfied that the conversations were incidental and not substantial in relation to the entertainment. The presumption that the active conduct of trade or business is considered not to be the principal character of the combined business and entertainment activity on the yacht, rebuttable by clearly establishing to the contrary, has not been rebutted. Lebeda did not testify at the trial herein. Grana testified as follows: Q: Do you -- were you privey [sic] or did you overhear or were aware of any conversations between Mr. Lebeda and Mr. Wott? A: Yes, *329 I did on several occasions come up from down below and we did a lot of driving from the bridge, and they were like engaged in a conversation and I would come in and would catch parts of it and all that. Q: I see. So there was some conversation. Do you recall any specifics with regard to this conversation? Do you remember the nature of the business? A: Well, George was in the process of deciding to get out of the hardware business and I think that him and Bob were talking about price or whatever. [Emphasis added.] Finally, petitioners argue that the "directly related" test of section 274(a)(1)(B) has been satisfied with respect to the foregoing uses of the yacht -- June 26, 1978 to July 5, 1978, and July 13, 1978 and July 18, 1978 -- in that the yacht was a "clear business setting" within the meaning of section 1.274-2(c)(4), Income Tax Regs. We disagree. Section 1.274-2(c)(4), Income Tax Regs., provides that entertainment shall not be considered to have occurred in a clear business setting unless it is clearly established *330 that "any recipient of the entertainment would have reasonably known that the taxpayer had no significant motive in incurring the expenditure, other than directly furthering his trade or business."
It is clear from the record herein that Robert's invitation to Harry and Pat Myers was not couched in terms of a business meeting. [16] Harry was not a client of Robert or of the partnership. The Myers brought along their 13-year old son. While petitioner testified that when he invited Harry Lebeda he made it clear that the purpose of the trip was to discuss the sale of his business, his testimony was not supported by any other evidence. George was not a client of Robert or of the partnership prior to the trip. Furthermore, the members of the Lebeda family were Cyndy's friends. We find, and so hold, that neither the Myers nor George knew that Robert had no significant motive, other than directly furthering his trade or business in inviting them on the trip. These are also not situations where there was no meaningful personal or social relationship between petitioners and the recipients of the entertainment. See sec. 1.274-2(c)(4), Income Tax Regs. *331 Cf. sec. 1.274-2(c)(3)(iii), Income Tax Regs.
The requirements of sections 274(a) and 274(d), and the regulations thereunder [17] have been satisfied with respect to the entertainment of: (1) William Jordan and his fiancee on August 13, 1978; (2) Mr. and Mrs. Allen Eliot on August 27, 1978; (3) Mr. and Mrs. William Youngquist and Mr. and Mrs. Robert Hutchinson on August 28, 1978; (4) Robert Drewniak and Mr. and Mrs. Guerin on August 29, 1978; (5) Jay M. Smyser and Kathy O'Leary on September 3, 1978; (6) John and Georgia Kuranz and Mr. and Mrs. J. L. Kuranz on September 4, 1978; (7) Mr. *332 and Mrs. George Lebeda on September 9 and 10, 1978; (8) Raymond and Mary Krysl on September 17, 1978; (9) William Jordan and Mr. and Mrs. Frank Nichols, and another couple on September 29, 1978; Emily Lebeda and her daughter on October 1, 1978; and (11) Charles Massaro on October 21, 1978. With respect to the foregoing 12 days of entertainment use of the yacht, the parties are in agreement as to the first element of substantiation *333 -- amount of the expenditures; the second and third elements of substantiation -- time and place -- have been established by the log kept by Robert, as conceded by respondent. Of the remaining two elements -- business purpose and business relationship -- the business purpose has been established to our satisfaction by Robert's log, petitioners' testimony, the testimony of the witnesses, [18] petitioners' exhibits, and circumstantial evidence. Although George and Emily Lebeda and Robert Drewniak did not testify, we are satisfied that the last substantiation requirement, business relationship, was satisfied, for the aforesaid days, by Robert's log, petitioners' testimony, and by circumstantial evidence. It has also been established that during the foregoing 12 days of use, the yacht was used for the conduct of substantial and bona fide business discussions, viz, that the yacht was used for the furtherance of Robert's business; and that the expenditures allocable to the said 12 days of use *334 were directly related to Robert's business, since the requirements of section 1.274-2(c)(3)(i) -- (iv), Income Tax Regs., have been satisfied. The requirements of section 274(a)(1)(B) and the regulations thereunder were not satisfied with respect to the entertainment use of the yacht on August 20, 1978, when petitioners invited George Arquilla and his wife aboard the yacht. The Arquillas were petitioners' neighbors in 1978. They were not clients of Robert or of the partnership, and considered petitioners' invitation a "neighborly act." Petitioners and the Arquillas went from the Chicago Yacht Harbor to New Buffalo, Michigan. Petitioners and the Arquillas discussed the contracting business, the state of the economy and of George's company's affairs, and Robert's clients and his past association with the partnership. The formation of a home-owners association at petitioners' and the Arquillas' neighborhood was also discussed. As George testified, this discussion was not directly related to any specific business matter and did not last more than a half hour. The Arquillas were again invited aboard the yacht for the Chicago Yacht Club annual cruise in July 1980. Although there was *335 some confusion in George Arquilla's mind as to whether the above-mentioned discussion with petitioners had taken place in 1978 or 1980, we find it relevant that: (1) Arquilla testified that on one of the two occasions there was no business discussion and that he considered it a social occasion; (2) Arquilla did not consider the activity a business one.No income resulted to petitioner or to the partnership from this discussion. We are satisfied that regardless of whether the foregoing discussion between petitioners and the Arquillas occurred in 1978, the said discussion was incidental to the entertainment, and not a substantial and bona fide discussion. It has also not been established that the expenditures allocable to this use of the yacht were directly related to the active conduct of Robert's trade or business within the meaning of sections 1.274-2(c)(3) or (4), Income Tax Regs. It has not been established that Robert had more than a general expectation of deriving some income or some specific business benefit from the activity. Sec. 1.274-2(c)(3)(i) and (ii), Income Tax Regs. Nor has it been clearly established that the active conduct of business was the principal *336 character of the activity. Sec. 1.274-2(c)(3)(iii), Income Tax Regs. The yacht was not a clear business setting as contended by petitioners. Arquilla's testimony that he considered petitioner's invitation a "neighborly act" is inconsistent with a finding that the Arquillas would have reasonably known that petitioner had no significant motive, in incurring the expenditure, other than directly furthering his business. See sec. 1.274-2(c)(4), Income Tax Regs.
As we have found, the 11 calendar days of repair or maintenance use are included in the total calendar days of use. The apportionment contemplated by section 274 is achieved by allocating the calendar days of repair or maintenance use between the business and the nonbusiness categories in the same proportion as the otherwise determined calendar days of business and nonbusiness use in dertermining whether the yacht was used primarily for the furtherance of Robert's trade or business. Davidson v. Commissioner,supra. Since, for 1978, less than 50 percent of the *337 total calendar days of use of the yacht were days of business use, petitioners' use of the yacht does not satisfy the test of section 1.274-2(e)(4)(iii), Income Tax Regs. Apportionment of the calendar days of repair and maintenance use does not change the ratio of business use to nonbusiness use. The nonbusiness use was greater than the business use. Respondent has carried his burden of proof to show that the primary use of the yacht was not a business use, even under the general requirements of section 1.274-2(e)(4)(i), Income Tax Regs. In determining whether business use of a facility exceeds personal use, all of the facts and circumstances are to be considered. Some of the factors to be considered are: (1) The nature of each use; (2) the frequency and duration of use for business purposes as compared to other purposes; and (3) the amount of expenditures incurred during such use for business as compared with the amount of expenditures incurred during use for other purposes. Although petitioner's only motivation in acquiring *338 the yacht and inviting guests on the yacht (but for the two occasions conceded on brief) was to generate business, if his self-serving testimony is to be believed in full, we are satisfied that petitioner derived personal pleasure from owning and operating his yacht. As demonstrated by our analysis, supra, the personal, nonbusiness uses of the yacht and the expenditures connected therewith exceed the business uses of the yacht and the expenditures connected therewith. As we have also found, supra, the requirement that the expenditures were directly related to the active conduct of petitioner's business was also not satisfied with respect to most of the uses of the yacht. Since the requirements of section 274(a)(1)(B) are expressed in the conjunctive and not in the disjunctive, both requirements must be satisfied in order for any expenditures to be deductible and then only to the extent of the portion of such expenditures which are directly related to the active conduct of the taxpayers' trade or business. This is consistent with the purpose of section 274, to "prevent *339 tax abuses involving luxury facilities for entertainment, amusement, or recreational purposes." H. Rept. 87-1447, at 22 (1962), 1962-3 C.B. at 426; S. Rept. 87-1881, at 32 (1962), 1962-3 C.B. at 738. [19]
Respondent has satisfied his burden of proof with respect to the amounts originally allowed in his notice of deficiency. Rule 142(a). Petitioners have failed to carry their burden with respect to the amounts disallowed in the notice of deficiency. It follows that petitioners are not entitled to any of the claimed items of expense, including depreciation, other than the claimed interest expense, allowed by respondent. In view of our decision with respect to these issues, we need not address the parties' other contentions. Issue 3: Investment Tax Credit
Petitioners claimed, and respondent disallowed [20] an investment tax credit in the amount of $14,349.35 in connection with the purchase of the yacht in 1978. Petitioners filed Form 1045, Application for Tentative Refund, for the carry back of unused investment tax credit from 1978 to the years 1975, *340 1976, and 1977. Petitioners conceded on brief that the requirements of sections 162 and 274 must be satisfied for the claimed investment tax credit and its carry back to their taxable years 1975, 1976, or 1977 to be allowed. See secs. 162(a), 167, 38, and 274(a)(1)(B); sec. 1.48-1(b)(2), Income Tax Regs.; Dowell v. United States,522 F.2d 708 (5th Cir. 1975); Davison v. Commissioner,82 T.C. at 438. Since we have determined that the requirements of section 274(a)(1)(B) and the regulations thereunder have not been satisfied, it follows that petitioners are not entitled to any investment tax credit, as determined by respondent in his statutory notice of deficiency. To reflect the foregoing, Decision will be entered for the respondent.
Footnotes
1. Petitioners claimed a depreciable basis in the yacht of $148,283, and used the double declining balance method of depreciation over a 10-year useful life. Petitioners further claimed additional first year depreciation in the amount of $4,000. ↩
2. According to the log, the yacht was used on 31 days in 1978, and 30 of those 31 days, or 96.77 percent of the yacht's use, was for business purposes. Petitioners therefore deducted 3.23 percent, the portion allegedly attributable to their personal use of the yacht, from the total maintenance and operating, and depreciation expenses in order to arrive at the net claimed amount. ↩
3. Petitioners also claimed an interest expense deduction attributable to their personal use of the yacht in the amount of $273 (3.23 percent of $8,465) on Schedule A attached to their 1978 return.↩
4. Calculated as follows: ↩
Claimed Qualified Investment
$148,283.00 in the Boat
Multiplied by:
X .10    Total Investment Tax Credit
$ 14,828.30 Less: Personal Use (3.23 percent)
(478.95)
Claimed Investment Tax Credit
$ 14,349.35 5. Respondent arrived at this amount by taking the gross amount of maintenance and operating expenses, exclusive of interest and depreciation, ($7,878) and reducing the said amount by the portion of the said expenses allegedly attributable to petitioners' personal use of the yacht (3.23 percent). The computation is as follows: $7,878 - ($7,878 X .0323) = $7,623 (rounded to the nearest dollar amount). ↩
6. Respondent arrived at this amount by taking the depreciation allowance calculated by petitioners ($32,857, see n. 1) and reducing this amount by the portion allegedly attributable to petitioners' personal use of the yacht (3.23 percent). The calculation is as follows; $32,857 - ($32,857 X .0323) = $31,796 (rounded to the nearest dollar amount). ↩
7. See n. 4, supra.↩
8. All statutory references are to the Internal Revenue Code of 1954, as in effect in the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.↩
9. Secs. 162 and 167 fall within part VI of subchapter B, and section 262 falls within part IX of subchapter B of chapter 1 of the Code. Sec. 161 provides that "there shall be allowed as deductions the items specified in this part [part VI], subject to the exceptions provided in part IX." Sec. 262, falling within part IX of subchapter B, thus carves out exceptions to what might otherwise be deductible expenses under secs. 162 and 167. See Commissioner v. Idaho Power Co.,418 U.S. 1 (1974); Sharon v. Commissioner,66 T.C. 515 (1976), affd. per curiam 591 F.2d 1273 (9th Cir. 1978), cert. denied 442 U.S. 941↩ (1979).
10. Sec. 274(a)(1)(B)↩ was amended by sec. 361(a) of the Revenue Act of 1978, Pub. L. No. 95-600, 92 Stat. 2763, 2847. The amendment, applicable to items paid or incurred after December 31, 1978 in taxable years ending after such date, disallows deductions with respect to facilities used in connection with entertainment, amusement, or recreational activities. 11. Sec. 274(a)(1) provided as follows in 1978: (a) Entertainment, Amusement, or Recreation. -- (1) In General. -- No deduction otherwise allowable under this chapter shall be allowed for any item -- (A) Activity. -- With respect to an activity which is of a type generally considered to constitute entertainment, amusement, or recreation, unless the taxpayer establishes that the item was directly related to, or, in the case of an item directly preceding or following a substantial and bona fide business discussion (including business meetings at a convention or otherwise), that such item was associated with, the active conduct of the taxpayer's trade or business, or (B) Facility. -- With respect to a facility used in connection with an activity referred to in subparagraph (A), unless the taxpayer establishes that the facility was used primarily for the furtherance of the taxpayer's trade or business and that the item was directly related to the active conduct of such trade or business, and such deduction shall in no event exceed the portion of such item directly related to, or, in the case of an item described in subparagraph (A) directly preceding or following a substantial and bona fide business discussion (including business meetings at a convention or otherwise), the portion of such item associated with, the active conduct of the taxpayer's trade or business.↩
12. The claimed interest expense was allowed in full. See secs. 1.274-2(e)(3)(iii)(c), 1.274-6, Income Tax Regs.↩
13. Days of use of the yacht for repair or maintenance purposes and of dockside use are to be included in the total calendar days of use. Davidson v. Commissioner,82 T.C. 434, 442-443↩ (1984). 14. Petitioner testified as follows: Q: I will ask you one question, Mr. Wott and you will understand that I happen to be a boating person myself -- A: I didn't realize that sir. Q: -- so I have some appreciation of the problem. Would you agree with me that a 44 foot Trojan, to handle safely and properly, you would require at least two other people to be aboard with you for line handling.
A: That is correct, sir. Q: So if you hadn't asked Mr. Lebeda or Mr. Myers, you needed two other people really to handle that boat and particularly as you pointed out in the Welland Canal, you probably needed more than that. A: Right. There were two people from the standpoint of whenever you go through a lock, on the Lebeda, Grana, trip -- Q: Or whenever you come along side? A: Yes. But however on the Lebeda, Grana trip, the two people; I mean George Lebeda did not really actively get involved in helping. Q: Well, I understand.But [the] thrust of my question, I hope you agree with me, is that regardless of whether you discussed business or not, you needed two; really needed two able bodied persons to help you handle the boat properly. A: Generally that will be correct, yes. Especially during the first part of the trip, Your Honor. [Emphasis added.]↩
15. See n. 13, supra.↩
16. Harry testified as follows: Q: How did the invitation to go on that cruise arise? A: Well he [Robert] asked me and my wife if we would like to make the trip. He was picking up the boat and my wife is also half owner of my company, of course. Q: Yes. A: And it just worked out that I took my wife and my son, and I think he was about 13 at the time -- Q: Your son was about 13 years of age? A: Yes. And the three of us went on a trip with him. Q: Yes. A: And I have had boating experience, so that worked out fairly well too.↩ [Emphasis added.]
17. Congress granted respondent plenary authority to promulgate the necessary regulations to implement the purposes of sec. 274, not only under the general rule-making power granted in sec. 7805, but also under the mandate of sec. 274(i). The regulations have been found to reflect a reasonable interpretation of the statute on numerous occasions. See Andress v. Commissioner,51 T.C. 823 (1969), affd. 423 F.2d 679 (5th Cir. 1970); Sanford v. Commissioner,50 T.C. 863 (1968), affd. per curiam 412 F.2d 201 (2d Cir. 1969), cert. denied 396 U.S. 841 (1969); Ashby v. Commissioner,50 T.C. 409 (1968); Robinson v. Commissioner,51 T.C. 520↩ (1968).
18. William Jordan, Allen Eliot, William Youngquist, Robert Hutchinson, Jay M. Smyser, John Kuranz, Raymond Krysl, and Charles Massaro appeared, inter alia, as witnesses at the trial herein.↩
19. Sec. 4 of the Revenue Act of 1962, Pub. L. 87-834, 76 Stat. 960, 974, enacted sec. 274↩.
20. Respondent's disallowance of the claimed investment tax credit in the amount of $14,349.35, in his notice of deficiency is inconsistent with his allowance of a portion of the claimed depreciation expense.See sec. 1.48-1(b)(2), Income Tax Regs.↩